**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | |
|---|---|
| AMANDA K. SALSMAN, | CASE NO. 5:23-CV-01051 |
| Plaintiff, | |
| vs. | DISTRICT JUDGE BRIDGET MEEHAN BRENNAN |
| COMMISSIONER OF SOCIAL SECURITY, | MAGISTRATE JUDGE AMANDA M. KNAPP |
| Defendant. | **REPORT AND RECOMMENDATION** |

Plaintiff Amanda K. Salsman ("Plaintiff" or "Ms. Salsman") seeks judicial review of the final decision of Defendant Commissioner of Social Security ("Commissioner") denying her application for Disability Insurance Benefits ("DIB").  (ECF Doc. 1.)  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This matter has been referred to the undersigned Magistrate Judge for a Report and Recommendation pursuant to Local Rule 72.2.

For the reasons set forth below, the undersigned recommends that the Court **AFFIRM** the final decision of the Commissioner.

## I.    Procedural History

Ms. Salsman filed her DIB application on October 6, 2021.  (Tr. 87, 99.)  She alleged a disability onset date of July 19, 2021.  (*Id.*)  She alleged disability due to traumatic brain injury, foot pain, depression, and double vision.  (*Id.*)  After an initial denial by the state agency (Tr. 86) and denial upon reconsideration (Tr. 98), Ms. Salsman requested a hearing (Tr. 127-28).  A telephonic hearing was held before an Administrative Law Judge ("ALJ") on September 7, 2022, (Tr. 54), but ended prematurely because Ms. Salsman's counsel became ill (Tr. 63).  The hearing

1

was ultimately held on October 19, 2022.  (Tr. 31.)  The ALJ issued an unfavorable decision on November 15, 2022, finding Ms. Salsman not disabled.  (Tr. 11-30.)  The Appeals Council denied her request for review of the ALJ's decision on August 8, 2022, making the ALJ's decision the final decision of the Commissioner.  (Tr. 122-24.)  Ms. Salsman then filed the pending appeal.  (ECF Doc. 1.)  The matter is fully briefed.  (ECF Docs. 7, 9, 11.)

## II.     Evidence

### A.     Personal, Educational, and Vocational Evidence

Ms. Salsman was born in born in 1985, making her a younger individual on the alleged onset date.  (Tr. 23.)  She has a high school education.  (*Id.*)  She has past relevant work as a dietary aide, clothes sorter, and teacher's aide.  (*Id.*)

### B.     Medical Evidence

#### 1.     Relevant Treatment History

Seven months before the alleged onset date, in December 2020, Ms. Salsman was examined by podiatrist Reed Graham, DPM.  (Tr. 317.)  She presented for custom orthotics. (*Id.*)  The examination findings included Steppage type gait and possible foot drop, but good range of motion and excellent strength.  (*Id.*)  Dr. Graham assessed her with tarsal tunnel syndrome in both lower limbs, bilateral plantar fasciitis, and pain in both; he fitted her with custom-molded orthotics.  (Tr. 317-18.)

On July 14, 2021, Ms. Salsman was seen by Jacqueline Tulodzieski-Ahlstrom, DPM, of Summa Health, for bilateral foot pain.  (Tr. 465.)  Ms. Salsman reported numbness, tingling, and hypersensitivity in her feet (Tr. 465) but demonstrated no pain to palpation and normal motion on examination (Tr. 467).  She was prescribed Gabapentin.  (Tr. 468.)   Less than one week later, Ms. Salsman called Dr. Tulodzieski-Ahlstrom's office to say that her foot pain was keeping her

from being able to deliver hospital trays at work and asked for a letter stating that she could not work until her next podiatry appointment.  (Tr.  463-64.)  Dr. Tulodzieski-Ahlstrom provided a letter stating that Ms. Salsman could only do seated work.  (Tr. 464.)  Two days later, on July 21, 2021, Ms. Salsman called the office again to ask whether there was other medication or therapy she could try as next steps to help with the pain, since Gabapentin was not helping.  (Tr. 463.)

Ms. Salsman returned to see Dr. Tulodzieski-Ahlstrom on August 11, 2021, complaining that her continued foot pain caused her to wake up in pain and screaming in the mornings.  (Tr. 457.)  The doctor noted no structural abnormality to explain her reported level of pain.  (*Id.*)  On examination, she demonstrated no pain to palpation and had a normal range of motion, but had diffuse tenderness and hypersensitivity; her skin temperature was warm to cool, no edema was noted, and hair growth was present.  (Tr. 458.)  Dr. Tulodzieski-Ahlstrom recommended psychiatric evaluation and physical therapy, and ordered an EMG.  (Tr. 458.)

On August 23, 2021, Ms. Salsman was seen by Shaun M. Rine, D.O., of Summa Health Medical Group—Family Medicine.  (Tr. 393).  She reported depression that was improved but not entirely controlled and included crying spells; she also requested an increase in fluoxetine.  (Tr. 390-91.)  Examination findings showed normal mood, behavior, judgment, and thought content.  (Tr. 392-93.)  She was diagnosed with a mild episode of major depressive disorder and asked to return in three months for her depression/anxiety.  (Tr. 391.)

The next day, Ms. Salsman had an initial psychiatric evaluation with Rachel M. Courtney, D.O., also of Summa Health, after being referred by podiatry.  (Tr. 450-51.)  Dr. Courtney stated that Ms. Salsman was a "poor historian due to memory difficulties as well as a degree of alexithymia."  (Tr. 450.)  Ms. Salsman reported that she thought she had neuropathy but had not been diagnosed, and said walking exacerbated the pain in her feet.  (*Id.*)  She also

3

reported that it had been hard to meet people since she moved from Arizona in 2008, that her mother recently moved to Florida, and that she lived in a condo owned by her mother but was hoping to become more independent.  (*Id.*)  Ms. Salsman endorsed a traumatic history that included a motor vehicle accident in 2001, which necessitated an induced coma and extensive therapy, and using methamphetamine beginning around 11 or 12 years of age.  (Tr. 451.)  On examination, she was anxious with limited insight and judgment, but had intact memory and concentration, fair hygiene, and normal behavior.  (Tr. 453.)  Dr. Courtney increased Prozac (fluoxetine) to 40 mg and recommended follow-up in four weeks.  (Tr. 453-54.)

On September 14, 2021, Ms. Salsman was seen by optometrist Drusilla Grant, D.O., of Grant Vision Care.  (Tr. 571.)   At the appointment, which was unremarkable for vision issues, Ms. Salsman reported daily headache.  (Tr. 571.)  Additionally, when supplying Ms. Salsman's medical records to SSA, Dr. Drusilla provided a brief medical opinion letter dated December 28, 2021, which is summarized in section II.B.2.i., *supra*.  (Tr. 570.)

Ms. Salsman saw Elizabeth Bevington, M.D., of Summa Health Family Medicine, on September 27, 2021.  (Tr. 397.)  She reported burning pain in both feet that made it impossible to work at her cafeteria job, and said gabapentin 800 mg was not providing pain relief.  (Tr. 398.)  Examination revealed tenderness in her bilateral Achilles tendons and feet and reduced sensation on her feet, 5/6 on the right and 4/6 on the left.  (Tr. 399-400.)  Dr. Bevington referred her to a neurologist and pain management, and filled out her FMLA paperwork.  (Tr. 397, 401.)

Ms. Salsman attended a psychiatric office visit with Dr. Courtney on September 28, 2021, where she reported that she was feeling well and denied major symptoms of depression and anxiety, but endorsed ongoing difficult dynamics with her mother and neuropathy symptoms that were still being worked up.  (Tr. 435.)  On examination, she had fair judgment, coherent

thoughts, and intact memory but limited insight; other findings were within normal limits.  (Tr. 436.)  Regarding future treatment, Dr. Courtney reported that she "[d]iscussed with the patient the possibility of a functional neurological disorder, however she requires further work-up for possible medical causes of neuropathy prior to this diagnosis."  (*Id.*)  Dr. Courtney stated that Ms. Salsman was "gradually improving," continued her on Prozac, provided therapy, and recommended a follow-up in four weeks.  (Tr. 437.)

Two days later, on September 30, Ms. Salsman saw neurologist Dmitri Kolychev, M.D., where she reported burning pain in her feet for which Gabapentin provided minimal relief.  (Tr. 323-30.)  On examination, she demonstrated full strength in her extremities, normal tone, intact sensation, and normal reflexes and range of motion, but had an antalgic gait.  (Tr. 328.)  She also exhibited normal mood, behavior, judgment, and thought content.  (*Id.*)  Dr. Kolychev noted that Ms. Salsman reported a constant burning sensation in both feet but demonstrated no significant temperature loss.  (Tr. 323.)  He also noted that an EMG performed earlier that month showed no large fiber peripheral neuropathy, but indicated small fiber neuropathy was possible.  (*Id.*)

On October 20, 2021, Ms. Salsman had a consultation with pain management doctor Guang Yang, M.D., of Comprehensive Pain Management Specialists, for pain in her feet.  (Tr. 653.)  She also reported headaches, dizziness, and loss of balance.  (Tr. 654.)  On examination, her feet were sensitive to touch and she complained of mid-foot joint pain with palpation; her lower extremity strength was normal and sensation was normal to light touch to her feet and legs, but she had an antalgic gait.  (*Id.*)  Dr. Yang diagnosed chronic pain, polyneuropathy, and ankle and joint pain in both feet; he prescribed Lyrica and encouraged exercise.  (Tr. 656.)

In a follow-up appointment with Dr. Yang in November, Ms. Salsman received an increased dose of Lyrica.  (Tr. 651.)  She reported headaches, dizziness, and loss of balance.

5

(*Id.*)  In pain management appointments with Dr. Yang into early 2022, Ms. Salsman consistently reported worsening pain and demonstrated an antalgic gait and midfoot tenderness, but other examination findings remained unremarkable.  (*See* Tr. 633-648.)  Dr. Yang added a prescription of Nabumetone in January 2022.  (Tr. 641.)

Ms. Salsman attended a telehealth appointment with primary care provider Dr. Rine on October 26, 2021.  (Tr. 407-09.)  She reported that her neuropathy had improved since she started Lyrica, but said she still could not perform her job due to pain and requested that her FMLA be extended.  (Tr. 407-08.)  The next day, Ms. Salsman called the office to request an updated return to work letter, saying she was unable to walk and needed an additional three months.  (Tr. 424.)  Dr. Rine updated her FMLA forms with the requested extension.  (*Id.*)

In January 2022, Ms. Salsman called the nurse line at Summa Health Medical Group to report a sense that she could not pick her feet off the floor, reporting: "it's as if my brain and legs aren't connecting."  (Tr. 587.)  She also reported chronic, constant, severe pain, numbness, and tingling in both feet, but denied being unable to walk.  (*Id.*)  She was advised to call back if symptoms worsened, and an appointment was made with her primary care provider.  (*Id.*)

During a February 23, 2022 appointment with primary care provider Dr. Rine, Ms. Salsman reported some improvement in pain using alpha lipoic acid and an increased dose of Lyrica. (Tr. 696-97.)  She maintained normal mood, behavior, judgment, and thought content. (Tr. 698.)  A February 2022 lumbar spine MRI—performed at Mercy Health and read by Wassim Osama Malak, M.D.—revealed transitional anatomy characterized by lumbarization of S1 but no other abnormalities.  (Tr. 842-44.)

At a March 21, 2022 appointment with Dr. Rine, Ms. Salsman reported that she struggled to stand for more than 15 to 20 minutes at a time, switched positions frequently, and sat with her

6

legs elevated for relief.  (Tr. 690.)   Dr. Rine observed that the neuropathy in her feet was

uncontrolled, and that she planned to follow up with neurology.  (*Id.*)  Dr. Rine continued her on

Lyrica and advised her to follow-up with Cleveland Clinic Neurology.  (*Id.*)

Ms. Salsman attended a pain management office visit with Dr. Yang in April 2022,

complaining of bilateral foot pain.  (Tr. 625.)  Upon examination, she demonstrated tenderness

over the right sacroiliac ("SI") joint, mid foot pain with palpation, and an antalgic gait.  (Tr.

626.)  But she also had negative straight leg raising and normal strength and sensation of the

lower extremities.  (*Id.*)  She denied headaches or dizziness, but reported a loss of balance.  (*Id.*)

She reported that her leg and foot pain continued, but was better with increased Lyrica.  (Tr.

627.)  Her diagnoses remained the same, with the addition of spinal instabilities of the

lumbosacral region, and Dr. Yang advised Ms. Salsman to see a neuromuscular specialist.  (Tr.

626-27.)

Tony Ladadibi, D.O., of Comprehensive Pain Management provided trigger point

injections to Ms. Salsman for her bilateral foot pain.  (*See* Tr. 630.)  On April 20, 2022, she

received a SI joint injection.  (Tr. 630-631.)  Ms. Salsman later had a trigger point injection in

her right piriformis on May 26, 2022.  (Tr. 618-619.)

On May 4, 2022, Ms. Salsman had an appointment with Dr. Rine with chief complaints

of depression and foot pain.  (Tr. 683.)   Dr. Rine began Ms. Salsman on a trial of Cymbalta for

depression and referred her for aqua therapy for back pain.  (*Id.*)

On June 22, 2022, Ms. Salsman attended a new patient neurology evaluation at the

Cleveland Clinic with Robert Wilson, D.O., where she reported worsening numbness, tingling,

and burning pain in her feet and a history of a severe TBI in 2001.  (Tr. 674, 679.)   She said her

pain was debilitating and severely affected her functioning and quality of life, causing difficulty

with walking and activities of daily living.  (Tr. 674.)  She also reported drinking eleven to twelve beers per week, with a history of alcohol induced seizure, and daily marijuana use.  (*Id*.)  On cognitive examination, she was alert and oriented with normal speech and comprehension, but was distracted and needed redirection.  (Tr. 676.)  On motor examination, she had full strength and her sensation was intact to light touch, pin, and temperature, but sensation was altered and reduced in her feet; Romberg's sign was absent and her feet were purple; her reflexes were 3/4 and symmetric, with no clonus; her gait was antalgic and wide based.  (Tr. 676-77.)  Dr. Wilson noted her three-year history of neuropathic pain involving the soles of her feet, with laboratory testing and EMG findings negative, which suggested small fiber involvement.  (Tr. 677.)  He noted that her neurological examination was significant for a wide-based antalgic gait, sensory changes over the bottom of her feet, hyperreflexia, and cognitive slowing.  (*Id.*)  He recommended a trial of Topiramate, "which could be effective in treating her chronic headaches, neuropathy, and reduce her alcohol intake."  (*Id.*)  He also referred her to neuropsychiatric testing, a clinical psychologist, and a skin biopsy to evaluate for small fiber neuropathy.  (*Id.*)

On June 29, 2022, Ms. Salsman attended a neuropsychological evaluation with John Lace, Ph.D. and Ashley Miller, Ph.D., ABPP-CN, at the Cleveland Clinic—Neurology.  (Tr. 670-73.)  Ms. Salsman initially reported that the purpose of the appointment was to find the cause of her persistent foot pain, but endorsed cognitive concerns upon clarification; she noted a history of a TBI following a motor vehicle accident in 2001.  (Tr. 670.)  On examination, she was well groomed with a pleasant and appropriate mood and a somewhat labile affect, occasionally becoming close to tears.  (Tr. 671.)  She walked slowly, apparently due to discomfort in her legs and feet.  (*Id*.)  She had difficulty clearly articulating her concerns, benefited from redirection and repetition, and her speech was notable for word finding

difficulties and tangentiality.  (*Id.*)  Her thought processes were tangential with qualitatively slow cognitive processing.  (*Id.*)  Most embedded performance validity measures were within normal limits and she appeared to put forth a consistent and credible effort on testing.  (*Id.*) Examination results from computerized and other testing modalities included the following: low average auditory attention; low average to average complex auditory working memory; inattention and difficulty maintaining vigilance; impaired expressive language and processing speed; extremely low semantic verbal fluency; low average speeded reading.  (*Id.*)  Drs. Lace and Miller found Ms. Salsman's presentation consistent with a mild neurocognitive disorder, with primary dysfunction in attention-regulation circuits.  (Tr. 672.)  They encouraged Ms. Salsman to engage in psychotherapy, adhere to her psychiatric medication regimen, follow up with her physicians for management of foot pain, reduce marijuana and alcohol use, and consider outpatient speech therapy.  (*Id.*)

On July 1, 2022, Ms. Salsman attended a virtual initial evaluation with Anna Hayburn, Psy.D., at the Cleveland Clinic—Neuromuscular Center.  (Tr. 665-69.)  Ms. Salsman reported her most bothersome/significant symptoms as: fatigue, brain fog/cognitive concerns, activity intolerance, neuropathy, headaches, and depression/anxiety.  (Tr. 665.)  On examination, Ms. Salsman presented as well groomed and cooperative, with good eye contact, but a depressed mood, a blunted affect, hesitant speech, and mild verbal slurring.  (Tr. 668.)  Her thoughts were logical and relevant and her insight and judgment were fair, but she had a mild somatic preoccupation and mildly impaired attention and concentration.  (*Id.*)  Dr. Hayburn diagnosed major depressive disorder, recurrent, moderate with anxious distress, instructed Ms. Salsman to return in one month to begin treatment, and referred her to the Neuromuscular Center.  (*Id.*)

Later that month, Ms. Salsman returned to pain management specialist Dr. Yang for bilateral foot pain.  (Tr. 610.)  She was accompanied by her mother.  (Tr. 612.)  In addition to foot pain, Ms. Salsman reported dizziness and loss of balance; she denied headaches.  (Tr. 611.)  On examination, she demonstrated positive right piriformis tenderness, foot pain with palpation, and an antalgic gait, but had normal strength and sensation in the lower extremities.  (*Id*.)  Ms. Salsman was prescribed Zanaflex and continued on Lyrica.  (Tr. 612.)  She was encouraged to exercise and advised to return to the clinic in four weeks.  (Tr. 613.)

### 2.    Opinion Evidence

#### i.    Treating Sources

##### a.    Optometrist – Drusilla Grant, O.D.

On December 28, 2021, optometrist Dr. Grant opined that Ms. Salsman did not seem to have any physical impairments.  (Tr. 570.)  As to mental impairments, however, Dr. Grant wrote that Ms. Salsman processed auditory and visual information very slowly, had difficulty following directions and understanding concepts, and had a very poor memory.  (*Id*.)  She therefore would not recommend Ms. Salsman for a job requiring any thought or understanding.  (*Id*.)

##### b.    Neurologist – Robert Wilson, D.O.

In the office notes for Ms. Salsman's June 2022 initial neurology evaluation, as previously summarized in section II.2.B.1, *infra*, Dr. Wilson included the following opinion:

> From my professional neurological perspective the patient needs to be disabled from work in full time and part time capacity in physical and/or sedentary jobs. For this person to work is not ideal for this person's health and concerning for the patient, the employer, the co-workers, and the community the employer serves. The patient has been motivated to be well and a responsible patient, but needs to be maintained total and permanent disability.  Has cognitive issues daily and physical[ly] cannot work.

(Tr. 675.)

10

       c.       **Neuropsychologists – John Lace, Ph.D. and Ashley Miller, Ph.D., ABPP-CN**

Following their June 29, 2022 neuropsychological evaluation, as previously summarized in section II.2.B.1., *infra*, Drs. Lace and Miller made the following recommendations regarding Ms. Salsman's application for disability benefits:

> RECOMMENDATIONS: The patient reported working with an attorney to apply for SSDI benefits. Given her history and current presentation, it is likely that she will have significant difficulty obtaining and maintaining gainful employment and pursuing SSDI appears reasonable from a neuropsychological perspective. . . .

(Tr. 672.)  The evaluation report concluded: "The current evaluation was performed in the context of medical care and in response to specific internal referral question. It is not meant to constitute a legal or disability evaluation."  (Tr. 673.)

       ii.       **State Agency Medical Consultants**

State agency medical consultant Maria Congbalay, M.D., reviewed the medical records in January 2022 and found that Ms. Salsman could perform light work, could stand and walk for four out of eight hours, and could occasionally use foot controls.  (Tr. 92.)  Dr. Congbalay also opined that Ms. Salsman could: never climb ladders, ropes, or scaffolds; occasionally balance, crouch, and climb ramps and stairs; and frequently stoop and kneel.  (Tr. 93.)  Dr. Congbalay further stated that Ms. Salsman should avoid concentrated exposure to vibration and exposure to hazards.  (*Id.*)

State agency medical consultant Indira Jasti, M.D., reviewed the record in April 2022 and affirmed Dr. Congbalay's findings on reconsideration.  (Tr. 99-105.)

       iii.       **State Agency Psychological Consultants**

State agency psychological consultant Karla Delcour, Ph.D., reviewed Ms. Salsman's mental health records in November 2021.  (Tr. 94-95.)  Dr. Delcour determined that Ms. Salsman could sustain tasks in a setting without strict time pressure or production quotas, interact

occasionally with the general public, but would have difficulty responding appropriately to criticism from supervisors.  (Tr. 94.)  Dr. Delcour further opined that Ms. Salsman could work in a setting with well-defined goals and could carry out a simple routine despite minor changes in the work setting, but that that major changes would need to be explained in advance and implemented gradually.  (Tr. 95.)

State agency psychological consultant Paul Tangeman, Ph.D., reviewed the record in March 2022 and affirmed Dr. Delcour's findings on reconsideration.  (Tr. 105-06.)

**C.**     **Function Report**

Ms. Salsman completed a function report in November 2021.  (Tr. 258-65.)  She stated that her illnesses, injuries or conditions limited her ability to work because they did not allow her to walk or stay on her feet for long.  (Tr. 258.)  On a typical day, Ms. Salsman awoke with a burning sensation in her feet, went upstairs to let her dog out, and then took breakfast food to the table to limit walking.  (Tr. 259.)  She spent most of the day at the kitchen table, and used a motorized cart if she had to go to the store.  (*Id.*)  Ms. Salsman took her dog out occasionally on quick walks.  (*Id.*)  She used to remember more before her current conditions.  (*Id.*)  She dressed sitting down and waited to bathe until she had enough strength.  (Tr. 259.)

Ms. Salsman reported that she lived alone, cared for a pet dog, and performed household chores, including preparing simple meals (that could be made at the kitchen table) and doing laundry as needed (without putting the laundry away).  (Tr. 258-59.)   Ms. Salsman also said she shopped about once every two weeks, watched television, and handled her own finances.  (Tr. 261-62.)  She could not walk more than 100 feet without needing to rest and required reminders for medication and appointments.  (Tr. 261-63.)  She reported that stress caused her to get headaches or have occasional outbursts.  (Tr. 264

12

D.     **Hearing Testimony**

1.     **Plaintiff's Testimony**

Ms. Salsman testified before the ALJ via telephonic conference on October 19, 2022.[1]

Ms. Salsman said she was unable to work because she had problems with her feet and legs.  (Tr.

40.)  She said it was painful to stay on her feet for more than "moments of time."  (*Id.*)  She

could only walk ten to twenty feet before she had to take a break.  (Tr. 41.)  She could lift twenty

pounds.  (*Id.*)  She said that she had difficulty following instructions, getting along with others,

concentrating, remembering, and completing tasks.  (Tr. 42-43.)

Ms. Salsman said she did not communicate with anyone but her family.  (Tr. 43.)  She

could not stand in the kitchen to cook and had to be seated by the stove.  (*Id.*)  She said that the

problems with her feet had stayed the same since February 2021, except that that her feet hurt

more when she was resting them.  (Tr. 44.)  Ms. Salsman reported difficulty remembering

appointments and putting reminders on her phone.  (Tr. 45.)  She said she was recently in the

emergency room for seizure like activity at home.  (Tr. 46.)   The emergency department

provider reportedly did not tell her what caused the episode but advised her to get checked out

before driving.  (Tr. 47.)

2.     **Vocational Expert's Testimony**

A Vocational Expert ("VE") testified at the hearing.  (Tr. 47.)  The VE classified Ms.

Salsman's past relevant work was as a dietary aide (medium and unskilled but performed at

light), clothes sorter (light and skilled but performed at medium), and teacher's aide (light and

semi-skilled).  (Tr. 48.)  The VE also testified that a hypothetical individual of Ms. Salsman's

age, education, and work experience, with the functional limitations described in the ALJ's RFC

---

[1] Ms. Salsman began a hearing on September 7, 2022, but it ended abruptly when her counsel became ill.  (Tr. 54, 63-64.)  The ALJ relied only upon the October 19, 2022 hearing in his decision.  (*See* Tr. 14.)

determination, could not perform Ms. Salsman's past relevant work, but could perform representative positions in the national economy, including weight tester, ticket checker, and sorter. (Tr. 50.) The VE testified that employers generally would not tolerate an individual being off task 15 % or more of the time, or being absent more than two days per month. (*Id.*)

### III.    Standard for Disability

Under the Social Security Act, 42 U.S.C. § 423(a), eligibility for benefit payments depends on the existence of a disability. "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

> An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy[.]

42 U.S.C. § 423(d)(2)(A).

To make a determination of disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations, summarized as follows:

1.    If the claimant is doing substantial gainful activity, he is not disabled.

2.    If the claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3.    If the claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, the claimant is presumed disabled without further inquiry.

4.    If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if the claimant's impairment prevents him from doing past relevant work. If the claimant's impairment does not prevent him from doing his past relevant

14

work, he is not disabled.

5.      If the claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. § 416.920; *see also Bowen v. Yuckert*, 482 U.S. 137, 140–42 (1987).  Under this

sequential analysis, the claimant has the burden of proof at Steps One through Four.  *See Walters*

*v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).  The burden shifts to the

Commissioner at Step Five to establish whether the claimant has the Residual Functional

Capacity ("RFC") and vocational factors to perform other work available in the national

economy.  *Id.*

## IV.      The ALJ's Decision

In November 18, 2022 decision, the ALJ made the following findings:[2]

1.      The claimant has not engaged in substantial gainful activity since July 19, 2021, the alleged onset date.  (Tr. 17.)

2.      The claimant has the following severe impairments: peripheral neuropathy, arthritis, depression, anxiety, and substance addition disorder.  (*Id.*)

3.      The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (*Id.*)

4.      The claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) except she can never climb ladders, ropes, or scaffolds.  She can occasionally balance, crouch, crawl, and climb ramps and stairs.  She can frequently stoop and kneel.  The claimant can never work at unprotected heights or around moving mechanical parts.  She can have occasional exposure to vibration.  The claimant can perform simple, routine, and repetitive tasks but not at a production rate pace (e.g., assembly line work).  She is able to interact occasionally the with public and supervisors.  (Tr. 18-19.)

5.      The claimant is unable to perform any past relevant work.  (Tr. 23.)

---

[2] The ALJ's findings are summarized.

6.      The claimant was born in 1985 and was 35 years old, defined as a younger individual age 18-49, on the alleged onset date.  (*Id.*)

7.      The claimant has at least a high school education.  (*Id.*)

8.      Transferability of job skills is not material to the determination of disability.  (*Id.*)

9.      Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform, including merchandise marker, sorter, and routing clerk.  (Tr. 24.)

Based on the foregoing, the ALJ determined that Ms. Salsman had not been under a disability, as defined in the Social Security Act, since the alleged onset date through the date of the opinion.  (Tr. 24-25.)

## V.      Plaintiff's Arguments

Ms. Salman presents three assignments of error.  First, she argues that the ALJ erred in Step Two of the sequential evaluation by failing to consider all of her impairments when forming the RFC.  (ECF Doc. 9, pp. 1, 9-12.)  Second, she argues that the ALJ erred in evaluating the opinions of treating sources—Drs. Grant, Wilson, Lace, and Miller—and by failing to incorporate their opined limitations into the RFC.  (*Id.* at pp. 1, 12-19.)  Third, she argues the ALJ erred in evaluating her subjective symptoms.  (*Id.* at pp. 1, 20-26.)

## VI.      Law & Analysis

### A.      Standard of Review

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.  *See Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 405 (6th Cir. 2009) ("Our review of the ALJ's decision is limited to whether the ALJ

applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence.").

When assessing whether there is substantial evidence to support the ALJ's decision, the Court may consider evidence not referenced by the ALJ. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Hum. Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989)). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). "'The substantial-evidence standard . . . presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts.'" *Blakley*, 581 F.3d at 406 (quoting *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)). Therefore, a court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). Even if substantial evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

Although an ALJ decision may be supported by substantial evidence, the Sixth Circuit has explained that the "'decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 651 (6th Cir. 2009) (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007) (citing

17

*Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546-547 (6th Cir. 2004))).  A decision will also not be upheld where the Commissioner's reasoning does not "build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)).

**B.      First Assignment of Error: Whether ALJ Erred at Step Two When He Did Not Consider Headaches or Dizziness as Medically Determinable Impairments**

        Ms. Salsman argues that the ALJ erred at Step Two because he "failed to even mention" her headaches or dizziness, despite evidence of weekly headaches.[3]  (ECF Doc. 7, pp. 10-11.) The Commissioner responds that the ALJ did not err because the evidence did not show that headaches or dizziness were medically determinable impairments.  (ECF Doc. 9, pp. 9-10.)

        At Step Two, an ALJ must consider whether the alleged medical conditions are medically determinable impairments ("MDIs").  *See* 20 C.F.R. § 404.1520(a)(4)(ii).  An MDI "must result from anatomical, physiological, or psychological abnormalities which can be shown by medically acceptable clinical and laboratory diagnostic techniques" and "must be established by objective medical evidence from an acceptable medical source."  20 C.F.R. § 404.1521.  An ALJ may not rely solely on a "statement of symptoms, a diagnosis, or a medical opinion to establish the existence of an impairment(s)."  *Id.*  The plaintiff bears the burden of proving the existence of an MDI.  *See Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 548 (6th Cir. 2004).

        Here, the ALJ found the following impairments to be severe MDIs: peripheral neuropathy, arthritis, depression, anxiety, and substance addition disorder.  (Tr. 17.)  The ALJ found also found additional MDIs to be nonsevere—specifically, plantar fasciitis, tarsal tunnel syndrome, gastroesophageal reflux disease, esotropia, astigmatism, and sciatica—

---

[3] To the extent Ms. Salsman intended to assert Step Three arguments under SSR 17-2p, SSR 19-4p, or Listing 11.02, the arguments were not adequately developed and are deemed waived.  *See Hollon ex rel. Hollon v. Comm'r of Soc. Sec.*, 447 F.3d 477, 491 (6th Cir. 2006); *see also McPherson v. Kelsey*, 125 F.3d 989, 995 (6th Cir. 1997).

because those impairments imposed only minimal limitations on Ms. Salsman's ability to perform basic work activities. (*Id.*)  The ALJ nevertheless specified that any limitations caused by the nonsevere MDIs were incorporated into the RFC. (*Id.*)  The ALJ did not identify headaches or dizziness as MDIs, either severe or nonsevere. (*Id.*)

In arguing that the ALJ erred by not considering her headaches or dizziness at Step Two, Ms. Salsman cites to Social Security Ruling ("SSR") 19-4p, which "provides guidance on how [ALJs] establish that a person has [an MDI] of a primary headache disorder."  SSR 19-4p, 84 Fed. Reg. 44667, 44667 (Aug 26, 2019).  Primary headache disorders are "a collection of chronic headache illnesses characterized by repeated exacerbations of overactivity or dysfunction of pain-sensitive structures in the head," such as "migraines, tension-type headaches, and trigeminal autonomic cephalalgias."[4]  SSR 19-4p, 84 Fed. Reg. 44667, 44669.  A primary headache disorder will not be established as an MDI "based only on a diagnosis or a statement of symptoms," and instead must be established as an MDI "by considering objective medical evidence (signs, laboratory findings, or both) from an [acceptable medical source]."  *Id.* at 44670; *see also* 20 C.F.R. § 404.1521.

In the instant appeal, Ms. Salsman has not identified medical evidence showing that an acceptable medical source diagnosed her with a primary headache disorder and identified objective medical evidence supporting the diagnosis, as described in SSR 19-4p.  Instead, she bases her arguments exclusively on her own subjective reports of headaches and/or dizziness—several in the form of simple check-box references to reported symptoms at office visits.  (ECF Doc. 7, p. 10 (citing Tr. 433, 615, 622, 651, 665-66, 677, 793).)  Thus, she has not met her

---

[4] In contrast, an ALJ may "*not* establish secondary headaches (for example, headache[s] attributed to trauma or injury to the head or neck or to infection) as MDIs because secondary headaches are symptoms of another underlying medical condition."  SSR 19-4p, 84 Fed. Reg. 44667, 44669 (emphasis added).

burden to show that the ALJ should have treated her headaches and dizziness as MDIs at Step

Two of the sequential analysis. *See Wilson*, 378 F.3d at 548.

Ms. Salsman's citation to SSR 96-8p does not alter the analysis. (ECF Doc. 7, p. 12.)

SSR 96-8p articulates the Commissioner's "policies and policy interpretations regarding the

assessment of residual functional capacity (RFC) in initial claims for disability benefits. . . ."

SSR 96-8p, 61 Fed.Reg. 34474, 34475 (July 2, 1996). It provides, in pertinent part, that:

> [t]he RFC assessment considers only functional limitations and restrictions that
> result from an individual's *medically determinable impairment* or combination of
> impairments, including the impact of any related symptoms.

*Id.* (emphasis added). Because Ms. Salsman has failed to show that her headaches or dizziness

were MDIs, she has also failed to show that the ALJ erred when he did not treat them as

"impairments" at Step Two. *See also* 20 C.F.R. § 404.1505 ("The law defines disability as the

inability to do any substantial gainful activity *by reason of any medically determinable physical*

*or mental impairment* which can be expected to result in death or which has lasted or can be

expected to last for a continuous period of not less than 12 months.") (emphasis added).

For the reasons set forth above, the undersigned finds Ms. Salsman has not met her

burden to show that the ALJ erred by not treating her headaches or dizziness as MDIs.

Accordingly, the undersigned finds her first assignment of error is without merit.

**C.      Second Assignment of Error: Whether the ALJ Properly Evaluated the
         Persuasiveness of the Medical Opinions of Plaintiff's Treating Sources**

Ms. Salsman argues that the ALJ erred in assessing three treating source opinions,

namely the opinions provided by: optometrist Dr. Grant, neurologist Dr. Wilson, and

neuropsychologists Drs. Lace and Miller. (ECF Doc. 7, pp. 12-19; *see* Tr. 21-22.) She avers that

the ALJ failed to apply the regulatory framework, under which certain factors are used in

assessing the persuasiveness of medical opinions. (ECF Doc. 7, pp. 12-13 (citing 20 C.F.R. §§

404.1520(c); 416.920(c)).) The Commissioner responds that the ALJ considered the opinion evidence and reasonably concluded that the opinions of the state agency consultants were more persuasive than the statements of Ms. Salsman's treating sources. (ECF Doc. 9, pp. 11-16.)

### 1. Legal Framework for Evaluation of Medical Opinion Evidence

The Social Security Administration's ("SSA") regulations for evaluating medical opinion evidence require ALJs to evaluate the "persuasiveness" of medical opinions "using the factors listed in paragraphs (c)(1) through (c)(5)" of the regulation. 20 C.F.R. § 416.920c(a); *see Jones v. Comm'r of Soc. Sec.*, No. 3:19-CV-01102, 2020 WL 1703735, at *2 (N.D. Ohio Apr. 8, 2020). The five factors to be considered are supportability, consistency, relationship with the claimant, specialization, and other factors. 20 C.F.R. § 416.920c(c)(1)-(5). The most important factors are supportability and consistency. 20 C.F.R. §§ 416.920c(a), 416.920c(b)(2). ALJs must explain how they considered consistency and supportability, but need not explain how they considered the other factors. 20 C.F.R. § 416.920c(b)(2).

As to supportability, the regulations state: "The more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be." 20 C.F.R. § 416.920c(c)(1). In other words, "supportability" is the extent to which a medical source's own objective findings and supporting explanations substantiate or support the findings in the opinion.

As to consistency, the regulations state: "The more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." 20 C.F.R. § 416.920c(c)(2). In other words,

"consistency" is the extent to which a medical source's opinion findings are consistent with evidence from other medical and nonmedical sources in the record.

The undersigned turns to whether the ALJ's evaluation of the challenged medical opinions satisfied the regulatory framework for evaluation of medical opinion evidence.

### 2. Whether ALJ Properly Evaluated Opinion of Treating Optometrist

The ALJ evaluated the persuasiveness of Dr. Grant's opinion as follows:

> The claimant's optometrist, Drusilla Grant, OD, stated that the claimant processed auditory and visual information very slowly and she had difficulty following directions and understanding concepts []. Dr. Grant said that the claimant had very poor memory and she would not recommend the claimant for a job requiring any thought or understanding []. <u>The undersigned find Dr. Grant's opinion unpersuasive. As an optometrist, the claimant's mental functioning was outside the scope of her expertise. Moreover, the mental health treatment notes did not document any such significant mental dysfunction.</u>

(Tr. 22 (citations omitted) (emphasis added).)

Ms. Salsman argues that these findings were in error because Dr. Grant's opinions were based on "observations during treatment of Plaintiff," and because the ALJ's characterization of the mental health treatment records was "contrary to the evidence in the record . . . documenting the problems Plaintiff had with her memory and attention." (ECF Doc. 7, p. 17.) The Commissioner responds that this argument "amounts to nothing more than an improper invitation for the Court to reweigh the evidence, which it cannot do." (ECF Doc. 9, p. 13.)

As to the ALJ's obligation to explain how he considered consistency and supportability, the undersigned finds this requirement has been met. First, the ALJ adequately addressed supportability—the extent to which Dr. Grant's objective findings and supporting explanations support the findings in her opinion—when he correctly observed that Dr. Grant's findings related to matters outside of her expertise. (Tr. 22.) While Ms. Salsman argues Dr. Grant's opinions were based on her observations during treatment, the objective medical evidence set forth in Dr.

22

Grant's treatment records is focused—appropriately—on her eye examination findings.  (*See, e.g.,* Tr. 571-74.)  Particularly considering the significant disconnect between the subject of Dr. Grant's expertise and treatment and the area of functioning upon which she offered her opinion, the undersigned finds the ALJ's discussion adequately addressed supportability.

Second, the ALJ adequately addressed consistency—the extent to which Dr. Grant's opinion findings are consistent with evidence from other medical and nonmedical sources in the record—when he observed that "the mental health treatment notes did not document any such significant mental dysfunction."  (Tr. 22.)  Before making this finding, the ALJ had discussed and provided record support for findings of no more than moderate limitations in mental functioning (Tr. 18) and discussed Ms. Salsman's mental health treatment and evaluation records (Tr. 20-21).  He later went on to explain:

> As for the claimant's mental conditions, she had ongoing depression and anxiety along with a history of traumatic brain injury. She demonstrated only mild overall cognitive impairment during a neuropsychological evaluation. Moreover, the claimant's mood and anxiety appeared to stabilize to a large degree with treatment and her judgment, thoughts, and behavior were generally normal. Such facts suggest that she could perform simple tasks in the socially limited environment of the residual functional capacity.

(Tr. 23.)  Based on a review of the record and the decision as a whole, the undersigned finds the ALJ was supported by substantial evidence when he found Dr. Grant's opinion as to mental limitations was not consistent with the level of mental dysfunction documented in Ms. Salsman's treatment records.  Certainly, Ms. Salsman has not met her burden to show how the medical evidence outlined in her brief requires a finding that the ALJ lacked substantial evidence to support his persuasiveness findings.

For the reasons stated above, the undersigned finds Ms. Salsman has not met her burden to show that the ALJ's findings as to the persuasiveness of Dr. Grant's medical opinion lacked the support of substantial evidence.

### 3.     Whether ALJ Properly Evaluated Opinion of Treating Neurologist

The ALJ evaluated the disability-related statements of neurologist Dr. Wilson as follows:

> Robert Wilson, D.O. said that the claimant was disabled from work, including
> sedentary jobs because her working was not ideal for her health []. <u>The undersigned
> finds such statement unpersuasive. Dr. Wilson's statement was conclusory with no
> description of specific limitations the precluded the claimant from working.
> Moreover, the determination of disability is reserved to the Commissioner.</u>

(Tr. 22 (citation omitted) (emphasis added).)

Ms. Salsman argues that the ALJ's findings were in error because they were "contrary to

the treatment record," which included physical and mental examination findings, diagnoses, and

a referral for a neuropsychological examination.  (ECF Doc. 7, pp. 14-15 (citing Tr. 676-78).)

The Commissioner responds that the ALJ's findings were not in error because Dr. Wilson's

statements were not a "medical opinion" and the ALJ was not required to discuss any statements

offering an opinion as to whether Ms. Salsman was disabled.  (ECF Doc. 9, pp. 14-15.)

The Commissioner's arguments are well taken.  To the extent Ms. Salsman is challenging

the ALJ's analysis of Dr. Wilson's statements that Ms. Salsman "needs to be disabled from work

in full time and part time capacity in physical and/or sedentary jobs" and "needs to be maintained

total and permanent disability" (Tr. 675), the governing regulations establish that the ALJ had no

obligation to consider or address those findings.  Specifically, the regulations establish that any

statements as to whether a person is or is not "disabled, . . . able to work, or able to perform

regular or continuing work" and any statements regarding an RFC that use "programmatic terms

about functional exertional levels . . . instead of descriptions about . . . functional abilities and

limitations" are "inherently neither valuable nor persuasive."  20 C.F.R. § 404.1520b(c)(3)(i),

(v).  An ALJ need not "provide any analysis about how [he] considered such evidence in [his]

determination or decision."  20 C.F.R. § 404.1520b(c).  Ms. Salsman has therefore failed to

demonstrate that the ALJ erred in his consideration of those statements.

To the extent Ms. Salsman is arguing that the ALJ erred in finding Dr. Wilson's statements were "conclusory with no description of specific limitations [that] precluded the claimant from working" (Tr. 22) because Dr. Wilson's medical records contained examination findings, diagnoses, and recommendations for further treatment, she misapprehends the nature of the "medical opinions" that must be evaluated for persuasiveness under the regulations.  *See* 20 C.F.R. § 404.1520c(a) (outlining how "medical opinions" are evaluated for persuasiveness).

A "medical opinion" is defined as "a statement from a medical source about what [a plaintiff] can still do despite [her] impairment(s) and whether [she] ha[s] one or more impairment-related limitations or restrictions" in the ability to perform the physical, mental, or other demands or work, or to adapt to environmental conditions.  20 C.F.R. § 404.1513(a)(2).  In contrast, a medical source's "judgments about the nature and severity of . . . impairments, . . . medical history, clinical findings, diagnosis, treatment prescribed with response, [and] prognosis" are classified as "[o]ther medical evidence."  20 C.F.R. § 404.1513(a)(3).

Ms. Salsman has not identified any part of Dr. Wilson's records that set forth an opinion as to what Ms. Salsman can still do despite her impairments or whether she has specific impairment-related limitations or restrictions in her ability to perform work.  20 C.F.R. § 404.1513(a)(2).  Her references to "other medical evidence" in Dr. Wilson's medical records, such as examination findings and diagnoses, do not remedy the absence of a medical opinion requiring a persuasiveness analysis by the ALJ.

For the reasons stated above, the undersigned finds Ms. Salsman has not met her burden to show that the ALJ erred in his analysis of Dr. Wilson's statements.

### 4.     Whether ALJ Properly Evaluated Opinion of Treating Neuropsychologists

After summarizing the subjective reports, examination findings, and diagnoses detailed in the neuropsychological evaluation by Drs. Lace and Miller, the ALJ noted that "[t]he examiners,

John Lace, Ph.D. and Ashley Miller, Ph.D., said that [Ms. Salsman] would likely struggle to obtain and maintain gainful employment. . . ."  (Tr. 21.)  He went on to explain:

> The undersigned finds the statements of Dr. Lace and Dr. Miller unpersuasive because they <u>did not explain any particular limitations that would prevent the claimant from maintaining employment</u>.

(Tr. 22 (emphasis added).)

Ms. Salsman argues that this finding was in error because the evaluation report from Drs. Lace and Miller "document[s] limitations Plaintiff would have related to her impairments in sustained attention/vigilance, expressive language, and aspects of learning/memory."  (ECF Doc. 7, p. 16.)  As with Dr. Wilson, the Commissioner responds that the statements of Drs. Lace and Miller were not "medical opinions" and the ALJ was not required to discuss any statements offering an opinion as to whether Ms. Salsman was disabled.  (ECF Doc. 9, pp. 14-15.)

The Commissioner's arguments are again well taken.  To the extent Ms. Salsman is challenging the ALJ's analysis of statements by Drs. Lace and Miller that she "will have significant difficulty obtaining and maintaining gainful employment" and that "pursuing SSDI appears reasonable from a neuropsychological perspective" (Tr. 672), those observations are inherently neither valuable nor persuasive and need not be addressed.  20 C.F.R. § 404.1520b(c). To the extent she is arguing that the ALJs findings were in error because the neuropsychological report contains examination findings that are suggestive of certain limitations, she is again focusing her argument on "other medical evidence" rather than "medical opinion" evidence. *Compare* 20 C.F.R. § 404.1513(a)(2) (defining "medical opinion" evidence) *with* 20 C.F.R. § 404.1513(a)(3) (defining "other medical evidence").

Ms. Salsman has failed to identify any part of the neuropsychological evaluation report by Drs. Lace and Miller that sets forth a "medical opinion" as to what Ms. Salsman can still do despite her impairments or whether she has specific impairment-related limitations or restrictions

in her ability to perform work.  20 C.F.R. § 404.1513(a)(2).  Her references to clinical findings contained in the report do not cure this deficiency.

For the reasons stated above, the undersigned finds Ms. Salsman has not met her burden to show that the ALJ erred in his analysis of the statements by Drs. Lace and Miller.

Ms. Salsman's additional argument that the ALJ erred when he relied on the medical opinions of the state agency consultants in developing the RFC but "failed to include any of the other opined limitations stated by the treating sources" also lacks merit.  (ECF Doc. 7, pp. 17-19.)  As discussed above, Ms. Salsman has not met her burden to demonstrate that the ALJ erred in his analysis of the statements by his treating providers.[5]  The ALJ assessed Ms. Salsman's limitations in the four areas of mental functioning (Tr. 18), discussed the treatment records (Tr. 19-21), evaluated the persuasiveness of the medical opinion evidence (Tr. 21-22), and explained his reasons for adopting the limitations set forth in the RFC (Tr. 22-23).  He found the opinions of the state agency consultants persuasive in part and explained his reasons for diverging from those opinions in adopting the RFC.  (Tr. 22.)  Ms. Salsman has not shown this was in error.

For all of the reasons set forth above, the undersigned finds Ms. Salsman's second assignment of error is without merit.

**D.**    **Third Assignment of Error: Whether ALJ Properly Considered Subjective Symptoms**

In her third assignment of error, Ms. Salsman argues that the ALJ erred in his evaluation of her subjective symptoms because the ALJ should have found that the intensity, persistence, and limiting effects of Ms. Salsman's symptoms—in particular her pain and memory problems—precluded her from engaging in substantial gainful activity on a full-time sustained basis.  (ECF

---

[5] To the extent Ms. Salsman intends to assert a separate challenge to the ALJ's evaluation of the state agency consultants' medical opinions, the argument is not adequately developed and is deemed waived.  *See Hollon*, 447 F.3d at 491; *see also McPherson*, 125 F.3d at 995.

27

Doc. 7, pp. 20-25.)  The Commissioner argues in response that the ALJ adequately discussed the relevant evidence, including her subjective symptoms, and reasonably concluded that Ms. Salsman's limitations would not preclude all work.  (ECF Doc. 9, pp. 16-17.)

Under the two-step process used to assess the limiting effects of a claimant's symptoms, a determination is first made as to whether there is an underlying medically determinable impairment that could reasonably be expected to produce the claimant's symptoms.  *See* SSR 16-3p, 82 Fed Reg. 49462, 49463; *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 247 (6th Cir. 2007) (citing 20 C.F.R. § 416.929(a)).  If that requirement is met, the second step is to evaluate the intensity and persistence of the claimant's symptoms to determine the extent to which they limit the claimant's ability to perform work-related activities.  *See* SSR 16-3p, 82 Fed Reg. 49462, 49463; *Rogers,* 486 F.3d at 247.  There is no dispute that the first step is met in this case (Tr. 19), so the discussion will be focused on the ALJ's compliance with the second step.

When the alleged symptom is pain, an ALJ should evaluate the severity of the alleged pain in light of all relevant evidence, including the factors set out in 20 C.F.R. § 416.929(c).  *See Felisky v. Bowen*, 35 F.3d 1027, 1038–39 (6th Cir. 1994).  Those factors include daily activities, types and effectiveness of medications, treatment received to address symptoms, and other factors concerning a claimant's functional limitations and restrictions due to pain or other symptoms.  *See* SSR 16-3p, 82 Fed. Reg. 49462, 49465-49466; 20 C.F.R. § 416.929(c)(3).

Here, the ALJ considered Ms. Salsman's allegations that she could not work due to the symptoms of her combination of impairments, including "foot pain" and difficulty "concentrating, remembering, and completing tasks."  (Tr. 19.)  Nevertheless, he found that Ms. Salsman's statements concerning the intensity, persistence and limiting effects of those symptoms were not entirely consistent with the medical evidence and other evidence in the

record.  (*Id.*)  In support of this finding, he discussed Ms. Salsman's treatment records (Tr. 19-21) and considered the persuasiveness of the medical opinion evidence (Tr. 21-22).

As to Ms. Salsman's complaints of foot pain, the ALJ acknowledged her pain complaints to providers, her use of prescription medication with varying success, her unremarkable EMG findings, and physical examination findings reflecting tenderness and/or reduced sensation in the feet and an antalgic gait, but also reflecting independent walking, normal strength and tone, and largely normal sensation. (Tr. 20, 22-23.)  The ALJ also noted that Ms. Salsman's activities of daily living included caring for her dog, shopping, performing household chores, preparing simple meals, watching television, and handling her finances.  (Tr. 18 (citing Tr. 259-62, 436, 453).)  Finally, he considered the opinions of the state agency medical consultants that Ms. Salsman could perform a reduced range of light work and found the opinions only partially persuasive because: Ms. Salsman's normal strength and muscle tone suggested she could use foot controls normally; and the combination of her neuropathy and arthritis symptoms required a reduction to sedentary exertional work.  (Tr. 21-22 (referring to Tr. 328, 611, 626, 654).)  Having considered all of this evidence, the ALJ concluded:

> With respect to the claimant's alleged symptoms and limitations, the undersigned finds such assertions only partially consistent with the evidence. The record reflects that the claimant had ongoing pain in her feet related to neuropathy. She had an antalgic gait and decreased sensation, but the record indicated that she generally walked independently. Moreover, she maintained generally normal strength at exams and an EMG did not document significant findings. Accordingly, the record shows that the claimant could perform the reduced range of sedentary work described in the residual functional capacity.

(Tr. 22-23.)

As to Ms. Salsman's memory complaints, the ALJ acknowledged that she had mild cognitive delays with some memory problems, but noted that she was able to understand and follow medical advice, watch television, and manage her finances.  (Tr. 18 (citing Tr. 261-62).)

The ALJ discussed her mental health treatment records, which noted intact memory and concentration, and described her neuropsychological evaluation findings, which assessed her with low average to average complex auditory working memory.  (Tr. 20-21.)  The ALJ also considered the opinions of the state agency psychological consultants that Ms. Salsman had no limitations in understanding, remembering or applying information (Tr. 18, 90, 94, 101, 105) and found their medical opinions as to Ms. Salsman's mental limitations persuasive in part because the record confirmed that she could perform simple tasks in a socially restricted environment but did not establish that she required a relatively static environment (Tr. 22).  Having considered all of that evidence, the ALJ explained:

> As for the claimant's mental conditions, she had ongoing depression and anxiety along with a history of traumatic brain injury. She demonstrated only mild overall cognitive impairment during a neuropsychological evaluation. Moreover, the claimant's mood and anxiety appeared to stabilize to a large degree with treatment and her judgment, thoughts, and behavior were generally normal. Such facts suggest that she could perform simple tasks in the socially limited environment of the residual functional capacity.

(Tr. 23.)

Thus, consistent with the regulations, the ALJ considered the types and effectiveness of medications, course of treatment and response to treatment, activities of daily living, objective medical evidence, medical opinions, and other evidence of record when assessing the consistency of Ms. Salsman's subjective statements.  Ms. Salsman has not shown that the ALJ mischaracterized or failed to consider specific evidence.  Instead, she has broadly summarized the medical records and argued summarily that the ALJ erred in finding she could perform the reduced range of sedentary work because that finding "was contrary to the evidence which supported Plaintiff's allegations of disabling pain" and her "documented memory problems." (ECF Doc. 7, pp. 20-24.)  She also asserts without elucidation that "the ALJ failed to articulate

any supportable rationale for his finding that Plaintiff's statements, as detailed above, were not entirely consistent with the medical evidence." (*Id.* at p. 24.)

The Court finds Ms. Salsman's argument that the ALJ failed to adequately articulate his findings regarding her subjective complaints to be meritless. While Ms. Salsman argues that the evidence supports a finding that the symptoms from his pain and memory problems were more limiting than the ALJ found them to be, it is not this Court's role to "try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner*, 745 F.2d at 387. Ms. Salsman has not met her burden to show that the ALJ erred in considering her subjective complaints, and the undersigned finds the ALJ adequately explained his reasons for finding the subjective complaints were not entirely consistent with other evidence in the record. Accordingly, the undersigned finds Ms. Salsman's third assignment of error is without merit.

## VII.    Recommendation

For the foregoing reasons, the undersigned recommends that the Court **AFFIRM** the Commissioner's decision.

May 1, 2024                                     s/Amanda M. Knapp
                                        _____

                                        AMANDA M. KNAPP
                                        UNITED STATES MAGISTRATE JUDGE


## OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this document. Failure to file objections within the specified time may forfeit the right to appeal the District Court's order. *See Berkshire v. Beauvais*, 928 F.3d 520, 530 (6th Cir. 2019); *see also Thomas v. Arn*, 474 U.S. 140 Dated: April 17, 2023(1985).